Oral argument not to exceed 15 minutes per side. Randolph Frieking for the appellant. That happens. Good morning. May it please the court, Randy Frieking on behalf of Dr. Nadia Nathan. Your Honors, this case, I'm sorry I'd like to reserve seven minutes for rebuttal. This case, of all cases, highlights the increasing problem of the use of summary judgment, particularly in employment discrimination and retaliation cases. If you read the lower court's decision, what it reveals is a complete failure to give any inferences to the testimony of Dr. Nathan, to the testimony of other doctors in her favor, and to the voluminous record of documents in her favor. The court essentially ignored reams of comparative data that we obtained in rather contentious discovery because the defendant repeatedly refused to give us requested relevant documents. It delayed the briefing of summary judgment by a year. After the court ordered them to produce documents, they didn't produce them. We had to go back and get an order. And then we used those very same documents in a chart in our response to the motion for summary judgment. A chart is permissible evidence. It's a summary. It was a summary of all of these voluminous records. And what the district court said to us in response to our chart was that the district court is not required to look for evidence. I think the district court said your chart wasn't annotated in a way that made it easy to do that. Well, they all had cites the documents that had been produced. There was no challenge by the defendant that the chart was inaccurate. They can quibble with whether you can use this information to compare it to this information and that information and that. But the fundamental tenet that the chart was an accurate summary of all of these records that have been produced by about all of these other doctors who had committed the same quote unquote sins as Dr. Nathan and not. Freaking let me just cut to the chase if I could with you. At least my perspective in this case, because you only wanted to use eight of your minutes here and your initial argument. Yes. I want you to assume you've established your prima facie case on both termination or retaliation. So then we go on to pretext. Correct. Correct. In pretext. Basically, your claim rests upon similarly situated individuals. Right. That's a large part of it. Yes. Now, I count that there are at least six articulated reasons why Ohio State claims that they terminated this doctor. And I agree that you have raised a lot of issues with respect to whether each one of those actually happened or was as bad as Ohio State says it was or how she compares with with others. So we'll start with that assumption. But where I probably depart from your analysis, and that's why I want you to inform me why I'm wrong, is that I don't see anybody that you refer to in this record as being similarly situated that had anywhere near the combination of all the apparent interpersonal problems or practical problems that this was. So while you might find somebody that had some later starts, you might find somebody that was unavailable, you might find somebody else that manipulated the schedule, so on and so forth. You don't point to anybody that's similarly situated other than in one of the six different areas, let alone all six. So what do I do with that? Right. Well, there's some question whether there's two reasons, there's five reasons, and there's six reasons. But I think at some point they do get up to six. How I would respond to that, Your Honor, is that, frankly, what happened here was he allegedly, Dr. Harder said that when he became the chair in February of 2009, he gave Nadia Nathan a clean slate. Okay? Because he had been copied on this, these complaints in the past from her and the discipline, et cetera, under Dr. Zavar. But he said, let's have a clean slate. My particular problem with this case is that after February of 2009, when she allegedly was given a clean slate, two months later she's fired. And there's only two things that he cites to in that period, both of which are suspect. The one is he says that before he decided to fire her, he got an email notice of some bad scores in April of 2009. Now, despite all of these records being produced, the only person who offers any evidence on his alleged receipt of this report is Dr. Harder. There's no email that's ever been produced that he allegedly saw. Before we get into the details of what actually happened during that two-month period, just as a practical matter, and I don't know the answer to this, is Ohio State then actually bound in some contractual or estoppel way or whatever from this, you're starting with a clean slate with me? Or can they, can he change his mind and say, you know, not much happened to this two months, but I think I was wrong to say, now that I understand what you're like, and I'm going to rely upon all these things. Are they entitled to do that? I think they're entitled to do that at a trial. I don't think they can take the position that she was given a clean slate for purposes of summary judgment and then use a bunch of incidents from 06, 07, 08 against her. And in your question before about the other doctors and our comparators, many of them have multiple quote-unquote sins. You know, they list these six. Does anybody have more than two of the six? Dr. A is the one who threatened to go home sick if he did not get his preferred support staff. He had the second lowest teaching score, May 08 to April of 09. He started cases late 43% of the time. She was criticized for starting late 16% of the time. He started his first cases late 47% of the time in 2009, 2010. He twice yelled at other people in hearing range of patients. You know, we've got, you know, one of the articulated reasons. So he's got three of the six, maybe. Right? Right. Okay. You're coming closer, but she's still pretty distinguishable, isn't she, in the magnitude of these alleged problems? Particularly if we apply the honest belief rule? How about, well, the honest, okay. You would think if he has three of the six, he would be disciplined. He would be reprimanded. He would receive an oral warning. Maybe you could say it didn't arise to the level of termination because he only had three out of six, et cetera, et cetera, et cetera. What we have here is Dr. Nathan getting reprimanded by Dr. Zavar repeatedly after she complained for one of these six or, you know, a second of these six. No record of discipline in these other doctors. There's two doctors that engage in a fist fight, and they say, hmm, that's okay. We're going to have a retreat. We're going to have a retreat so the anesthesiologists and surgeons can get along. But then when we fire Dr. Nathan, we're going to single her out as having a disruptive relationship with a surgeon. All we're saying here, I cannot imagine a case in which there's more documentary evidence that raises some issues of fact as to whether or not Dr. Harder and others have to be believed by a jury. That's really the standard. What Dr. Harder is saying here, the district court is saying no reasonable juror could second-guess his judgment. And I think we have plenty of documents, and I'll reserve my rebuttal time. Thank you. Good morning. Christina Correll. I'm here on behalf of The Ohio State University. And let me jump right in and respond to Judge McKeague's question, which was, was there anyone else who was an anesthesiologist at Ohio State who had the same level of these types of performance failures? The answer is yes. The answer is absolutely yes. Do you know what happened to those six? Are you talking about the other ones that were terminated? Those six anesthesiologists? And they're all male. They, too, were terminated, and they are all male, every single one of them. So the answer is yes. There were people that had the same level of performance issues. Now, I know we've got a mountain of documents in this case. We've produced 40,000 documents. We've all been through them all. We've all looked at them all. Now, I want to go back, and I want to make sure that the Court is very clear about something. This case does not come down to two months. Dr. Harder was appointed as the interim chair of this department in November of 2008. He made the ultimate decision to terminate Nadia Nathan's employment in April of 2009. That's six months. Now, why are we talking about a longer period of time? Let me tell you why we're talking about a longer period of time. Because the comparators that Dr. Nathan has put before the Court are being compared from time periods from 2006 and actually right up until today. And to go back to the allegation that there was no challenge to the accuracy of the information regarding the comparators, that's simply not true. We challenged the accuracy of the comparison because Dr. Nathan included in her comparator information a full two years of information on her comparators that did not apply to her because she was no longer employed at Ohio State University. She cited complaints from evaluation tools that weren't even used when she was employed at Ohio State University. The only thing that I don't understand about what you're saying now is that while I understand you go back to an earlier period because that's the earlier period being cited by them in this lawsuit. I get that. But that, of course, hadn't occurred at the time that she was terminated. And there is this supposed clean slate language. So was Ohio State going back earlier than the six months in connection with the reasons for termination? Not the defense of the claims here. Let me address it this way for you, and this is what Dr. Harder explained in his deposition. Dr. Harder was part of the leadership team under Dr. Zavara. I mean, that can't be denied. He was the number two in the department. He was in charge of all of the resident evaluations that were done, so he received all of the information regarding the performance issues of every single anesthesiologist in the department, not just Dr. Nathan. So that's a background for Dr. Harder. So he knows all of this stuff is going on before he becomes the interim chair in November of 2008. So his testimony indicates, look, I knew Dr. Nathan had these performance problems. I didn't know if it was because she just didn't get along with Dr. Zavara. I just didn't know. Dr. Harder testified, look, they had really very conflicting personalities, Dr. Nathan and Dr. Zavara, and he thought maybe it was just a personality conflict. So he was aware of all these prior issues, but he said, look, I'm going to give her a chance, and his words were to demonstrate that she can become a productive member of this faculty. That's what he was allowing her to do. So you're saying this clean slate comment was not a benchmark that narrows the focus of inquiry. It's simply that I'm going to make my own judgment, and if I detect something that triggers a connection to what I've heard before, then I'll give it some credence. But if I don't, I'll make my own judgment. Well, his testimony was he was going to make his own judgment regardless. Where does the clean slate language come from? In his testimony, he later did use the word, I wanted to give her a clean slate when he was asked what that meant. My question was really pretty simple. Is Ohio State only relying on what happened after the clean slate language? When you terminated her, not for your defense here, when you terminated her, were they relying on the earlier incidents? I'm sorry for the long answer. And the answer to that question is yes and no. And I'm sorry to have to answer it that way. We're moving closer, but not quite there yet. Can you pick one or the other? So this is the problem. Let me explain why I answered it the way I did. He wanted to give her a chance to right the ship. So after he became interim chair, she continued to engage in the exact same performance problems that she did before he became interim chair. I'm going to try one more time. He gives her the clean slate. She fails the test in his estimation. When then determining to ultimately terminate her, was he, does Ohio State claim they were relying upon things that happened before the clean slate? They were not relying on things that happened before the clean slate. But in our estimation, you can't just cut that baby down the middle. He can't purge his knowledge of, and remember what he's doing, he's giving her a chance to demonstrate that she can stop these prior behaviors. Is there any legal reason why they couldn't rely on things before this clean statement was made? No, no, no. I mean, this all came up because there's some attempt to try to discredit Dr. Harder from my estimation. I think we're trying to be too precise here. Okay. Did these earlier events inform the decision to fire her after the clean slate? They did, and it was not just— Is that all I wanted to know? Yes, absolutely. You're deciding whether to terminate an employer with a history of problems that goes back quite some, really to the inception of her employment. The inability to correct the problems over a period of time is likely going to be a consideration. And it absolutely was. But, you know, I didn't want to just cut off one from the other because they really were related. So I had asked about did any other employees have a similar combination of problems, and you started out your argument by saying, yes, those are the ones that were terminated. Were the ones that were not terminated that he is relying upon as similarly situated? He cited one doctor that might have had three or four out of the six. But aside from that possibility, what's your position as to whether any other of the similarly situated people he's relying upon came close to her problems? None of them did. I mean, the affidavit testimony of Dr. Harder really sums this case up. In his years of supervising anesthesiologists, and not just in this department, he has never run across anyone that was more disruptive, unprofessional, and unproductive. And that really sums it up. We haven't seen, I mean, look, I've poured over this stuff a million times. There's no one that even came close. And that's exactly what the district court found. So to answer your question, no. I mean, no one even came close. And you can parse about, and remember, we're here on issues of material fact, okay, material fact. You can parse about, you know, does Dr. Nathan have an explanation for some of this stuff? She might. Did other people do one or two of these same things? They did. Was there anyone that came close to her? No. But even more importantly, that's not the end of the analysis for pretext, okay? Remember, pretext, the burden is still on the plaintiff to demonstrate not only that the reasons that were given were pretext, but that the real reason was retaliation or discrimination. There's just absolutely no evidence in this record of that at all. And let me kind of go back. We agree that the only protected or the only basis for discrimination at this point, as the case comes to us, is gender, correct? That's correct. The other ones were dealt with by the district court, kind of swept away, and that's not the subject of this appeal. That's correct. And it's also our opinion that the only retaliatory conduct at issue in this appeal was her termination. There is no argument at all that's been made at this level that anything else constituted retaliation other than her termination. Oh, such as not appointing her as chair of the cardiac anesthesiology. I mean, I've read all the briefing. Those issues are outlined in the statement of facts, but there is absolutely no argument that's been presented on appeal about her. I mean, it's outlined in the facts, but there's no argument about the facts, the fact that she wasn't appointed to two particular positions, the fact that she had her research days evaluated along with everyone else. I mean, I didn't see any argument in that regard. The argument was as to her termination. And if I could, I'm glad you brought up retaliation because I think it behooves the court, even if we do jump ahead to what could become the ultimate issue in this case, which is pretext, to start at the beginning. I mean, this case is built upon a foundation of one thing, Dr. Zavara. And this lawsuit that Dr. Nathan filed against her former employer and the allegation in her complaint, her amended complaint, in her deposition, and throughout this entire case, was that this is the singular act that motivated Dr. Zavara to have some sort of beef with her. So let's look at that for a minute. Dr. Nathan started working at Ohio State in January of 2007. Her testimony is unwavering testimony. Dr. Zavara started retaliating against me from the minute I started at Ohio State. Well, when was this protected conduct that you claim has led to everything? Not until four months later. The lawsuit wasn't filed until April of 2007. So already, even on the first analysis, her allegation about where this retaliation is coming from doesn't hold water, it is not supported in the record. If you go on from that, so why would Dr. Zavara be motivated to retaliate against Nadia Nathan because of this lawsuit? What is it about this lawsuit that would motivate him to retaliate against her? Her position, the entire case, and her testimony has been it's because someone that Dr. Zavara, another anesthesiologist that Dr. Zavara sees one time a year, was named as a defendant in that lawsuit. I've just never heard any explanation at all, other than pure speculation, about how a relationship like that would motivate someone to violate federal law. I mean, that's just pure speculation in and of itself. If we move on from there to Dr. Harder, and remember, really, Dr. Harder is the only one that ever took any disciplinary action against Nadia Nathan. Dr. Nathan's testimony is the only reason that Dr. Harder did what he did was because of Dr. Zavara. I mean, she repeated it over and over in her deposition. I said to her, do you think Dr. Harder was discriminating against you because you're a woman? Nope, he was doing what Dr. Zavara wanted him to do. And, you know, from a cat's paw analysis, I mean, that's a classic cat's paw allegation. There's just no evidence at all on which to base any claim that Dr. Harder made any decision, in this case, based upon the advice of Dr. Zavara. In fact, he did the exact opposite of what Dr. Zavara recommended for him to do, which is not renew the appointment of Dr. Nathan. So if we look at the termination rather than the retaliation, we put that aside for just a second. Are you saying that even assuming that some of this is true, that Zavara wasn't biased against her because of her sex, he was biased against her because of the relationship with this other doctor? Well, I'm only telling you... Not a protected category, as far as I know. I'm only telling you what the allegations of Dr. Nathan have been. Dr. Nathan's claims... I'm asking you what you're arguing here. Are you arguing that even if true, it doesn't give rise to sex discrimination? Well, I don't think there's any evidence of sex discrimination. I mean, there's absolutely no evidence in the record of sex discrimination. I mean, if you look at the statistics at the department, men have been terminated at a vastly higher rate in comparison to the percentage of population in that department than women. But what I'm saying is I've never really had an understanding of how the retaliation claim has any legal effect because... Well, the retaliation claim is based on the lawsuit, which was a complaint about sexual harassment. And so that would qualify under Title VII. But you're saying, based upon the timing, that the adverse actions were taken before the protected conduct occurred, and therefore they can't be a causal link? That's where you are? That's the first thing I'm saying. The second thing I'm saying is I haven't heard any evidence of what would motivate Dr. Zavara to retaliate against Dr. Nathan because of the lawsuit. What does Dr. Zavara care if there's a lawsuit that's filed in Massachusetts against a former employer? There's been no evidence presented in this case at all other than he sees one of the defendants once a year at a professional conference. How on earth would that motivate Dr. Zavara to allegedly violate federal law? So my argument is twofold. Okay. Other questions? Thank you very much. I appreciate it. Let's follow up a little bit on the last points that were made. When we conducted the deposition of Dr. Harder, he was clearly aware of her previous complaints about Dr. Zavara, which I will get to because there is a very clear temporal proximity between her complaint and when she's disciplined. Harder, and this is on page 26, I believe, of our reply. And so this is about he's being interviewed or deposed in the context of a decision to terminate her. One of the reasons he says he terminated her was that she was disruptive. Question. And so her complaints that she was being treated unfairly on the schedule you believe were disruptive? Absolutely. And which means that he's essentially taking against her the fact that she had complained about the treatment that she received from Dr. Zavara. Dr. Zavara, when he was interviewed for the position at Ohio State, asked Dr. Nathan about the lawsuit against his friend from Brigham and Women's Health. He starts to discipline her after he arrives by, you know, some subtle criticism. She filed a complaint in June of 2007 with Ohio State, which, by the way, was never investigated in two years. The investigator never talked to Dr. Zavara. The investigator never talked to Dr. Nathan, and two years later really could never explain what he did in his investigation. But June of 2007, her first formal complaint against Dr. Zavara, 11 days later, her first official letter of reprimand. Two months after that, second letter of reprimand. Two months after that, third letter of reprimand. Were any of these alleged reasons for her ultimate termination occurring during that period, or is it her position that she never had these problems to begin with, or she had them and she cleaned up her act, and so the only thing that happened during this temporal period you're talking about was the complaint? Well, the reasons for their termination, they're going all the way back to 06, 07, 08. I'm not asking that. Okay, I'm sorry. I'm asking you whether these six things that we've agreed they're claiming that she did or failed to do, were any of those also allegedly continuing after the complaint was made? So, in other words, you say that the complaint was the factor or a factor, I've forgotten what our test is in this particular case, but I'm asking you whether these other things were at least allegedly continuing to happen. Yes, no question. And you asked about the other doctors. I think it's a qualitative judgment. So, you know, it's not just she's got six offenses and this guy has three. Well, what if the three that this guy has are much worse than taking together the six? You know, there's a fist fight. Is that worse than complaining about sexual harassment? Yes. Should that get more points in this analysis? This is all stuff that should be sorted out by the jury, is my point. I mean, you can't say out of one side of your mouth, Dr. Nathan, I'm giving you a clean slate. The only inference you can draw from saying to somebody, I'm giving you a clean slate, is that I'm not going to hold the things in the past against you. And then two months later he fires her because he received some e-mail that they can't find and because she was absent one day. Why are you saying two months and she's saying six? I don't know, because in his deposition he testified he made the decision in April of 2009. When did he become the interim chair? Oh, he became the interim chair in November, so that's six months from there. He became the official chair in February. So you're counting it. Yeah, it doesn't. There's nothing between November of 2008 and April of 2009 that's any different than what happened between February. So much to do about nothing in my mind, either two or six, pick your poison, because the only thing that's happened is she's absent when she said she had food poisoning on her way back from China. And what's interesting about that is when she comes back, she came back the very next day, her doctor was in Boston, that's where she flew into. Does Dr. Harder say, Dr. Nathan, can I have a medical excuse for that? Does he question her about the fact she wasn't there? No. Then she's terminated and all of a sudden the fact that she missed work when she had food poisoning made him suspicious. Well, you know, the question's not whether she was in fact sick. The fact is whether the circumstances were such that he would have reasonably questioned that. And his position is he did question it. Right. And so do we defer to what he says was his suspicion that we don't hear about for two years until after the fact? If that were in isolation, but it might give much more cause for concern than it does in a situation like this where the course of conduct and the dealings are so protracted and there's just so much in the record. And as Judge McKee has referred several times, there's a recumulation of bases for action. I think you could pick out many of these doctors, Your Honor. And they're summarized, I believe, on pages 22 to 32. You could say there was a history of problems with any number of these doctors. Well, let's give you that. What's your best case to convince a jury that the termination was a result of your client's gender? Ten to 20 examples of males engaging in similar or worse conduct that are not even reprimanded, let alone being fired. Nadia Nathan is receiving oral warnings, written warnings. Somebody engages in a fistfight. Two doctors engage in a fistfight. Are they warned? No. There are safety issues brought up about other doctors. Are they warned? No. I mean, Dr. Nathan, the record as it sits right now, Dr. Nathan is the one receiving the discipline lesser than termination and then ultimately termination. Now, they mention these three doctors that Dr. Harder allegedly fired, these males, and counsel for the defendant stood up and said they were fired under the same six examples. We don't know that because Dr. Harder never identified them in his deposition or in discovery. The first time we heard of these three doctors were in their reply brief. We were given no opportunity to take his deposition after that and no opportunity, obviously, to obtain other records. That's when we got it. It was in the reply brief on the motion for summary judgment. And, sure, we filed a SIR reply, which was reluctantly granted by the district court. Any further questions? Thank you for your time and consideration. We appreciate the argument that both of you have given, and we'll consider the case carefully.